## IN THE UNITED STATES DISTRICT COURT
## FOR THE MIDDLE DISTRICT OF PENNSYLVANIA

ADAM JOSEPH BROWN,

           Plaintiff,

     v.

ERIC TICE, *et al.*,

           Defendants.

No. 4:20-CV-00698

(Chief Judge Brann)

## MEMORANDUM OPINION

### APRIL 19, 2022

Plaintiff Adam Joseph Brown filed this *pro se* Section 1983[1] action, asserting constitutional tort claims against various prison officials at the State Correctional Institution, Smithfield (SCI Smithfield), in Huntingdon, Pennsylvania. Presently pending is Defendants' motion for summary judgment[2] pursuant to Federal Rule of Civil Procedure 56.  For following reasons, the Court will grant in part and deny in part Defendants' Rule 56 motion.  The Court will also dismiss with prejudice several of Brown's claims under 28 U.S.C. § 1915(e)(2)(B)(ii) for failure to state a claim on which relief may be granted.

---

[1]  42 U.S.C. § 1983.  Section 1983 creates a private cause of action to redress constitutional wrongs committed by state officials.  The statute is not a source of substantive rights; it serves as a mechanism for vindicating rights otherwise protected by federal law.  *See Gonzaga Univ. v. Doe*, 536 U.S. 273, 284-85 (2002).

[2]  Doc. 32.

## I.    FACTUAL BACKGROUND[3]

Brown was transferred to SCI Smithfield in April 2018 and housed in the Behavioral Management Unit (BMU).[4]  His placement in this unit appears to be the result of his history of suicidal thoughts and self-harm, for which Brown asserts he was deemed "a behavior problem."[5]  Brown admits that—before being transferred to SCI Smithfield—he was criminally charged for assaulting defendant Lieutenant Louis Lusk when they were both at a different state prison,[6] an incident that Brown believes motivated the constitutional torts at SCI Smithfield.[7]

In his complaint, Brown outlines three separate incidents during which he contends that SCI Smithfield officials violated his constitutional rights.  The first event occurred on July 3, 2018.[8]  Brown avers that while he was in a psychiatric observation cell on suicide watch, defendant Corrections Officer Steve Dell—who

---

[3]  Local Rule of Court 56.1 requires that a motion for summary judgment be supported "by a separate, short, and concise statement of the material facts, in numbered paragraphs, as to which the moving party contends there is no genuine issue to be tried." LOCAL RULE OF COURT 56.1.  A party opposing a motion for summary judgment must file a separate statement of material facts, responding to the numbered paragraphs set forth in the moving party's statement and identifying genuine issues to be tried.  *Id.*  Brown did not file a responsive statement of material facts.  Accordingly, Defendants' statement of material facts, Doc. 33, will be considered admitted unless clearly contradicted by the record.  *See* LOCAL RULE OF COURT 56.1.

[4]  Doc. 33 ¶ 3.  Brown was transferred to SCI Benner in late 2020 and is currently incarcerated at SCI Phoenix.  *See id.* ¶ 1.

[5]  *Id.* ¶¶ 3-4; Doc. 34-1, Jan. 27, 2021 Brown Deposition 6:15-25 [hereinafter "Brown Dep."].

[6]  Doc. 1 ¶ 11.  Brown filed a verified complaint signed under penalty of perjury.  *See id.* at 10.  The assault on Lusk appears to have been an incident where Brown spit on Lusk.  Brown Dep. 35:7-18.

[7]  *See, e.g.*, Doc. 1 ¶¶ 12, 14, 16, 18, 19, 22, 23, 29-32, 40.

[8]  *Id.* ¶ 20.

was assigned to monitor Brown during the prison's third shift—provided Brown with a razor blade, encouraged him to "go for his jugular vein," and observed Brown cutting his neck for 30 minutes without taking any action to intervene.[9]

The next incident occurred three days later, on July 6.[10]  After again cutting his neck,[11] he was placed in a "restraint chair" by defendant Lieutenant Lynn Smith and a "compliance team" of correctional officers.[12]  Brown avers that, during this placement, he informed Smith and a registered nurse who was present that he had swallowed the razor blade used "to cut up with multiple times."[13]  Brown claims that neither Smith nor the nurse[14] took any action or sought medical attention, and further alleges that Smith told him that "if he died that's what he gets for what he did to Lt. Lusk."[15]  Defendants maintain that Brown was assessed by the nurse several minutes after being placed in the restraint chair and that he did not tell her that he had swallowed a razor blade or request additional medical treatment.[16]

---

[9]  *Id.* ¶¶ 20-21, 25.

[10]  *Id.* ¶ 26.

[11]  Brown attests that he cut himself with a razor, *see id.*; Defendants cite to a prison report that states that on July 6 Brown cut himself "presumably with his fingernail," Doc. 34-1 at 2.

[12]  Doc. 1 ¶ 26; Doc. 33 ¶ 23.

[13]  Doc. 1 ¶ 27.

[14]  Brown initially sued this nurse as a "Jane Doe" defendant.  *See id.* ¶ 8.  However, Brown never properly identified the nurse for service purposes and therefore this Jane Doe defendant was eventually dismissed under Federal Rule of Civil Procedure 4(m).  *See* Doc. 19.

[15]  Doc. 1 ¶¶ 28-29.

[16]  Doc. 33 ¶¶ 21, 23-25.

Finally, Brown avers that on August 3, 2018, defendant Sergeant Donald Britton sprayed him with "Oleoresin Capsicum" spray, otherwise known as "OC" or pepper spray, without justification and while Brown was confined in his cell.[17] Brown maintains that Britton told him that he pepper sprayed him for what Brown had done to Lusk in SCI Benner, and that Lusk was offering money to anyone who "got" Brown for him.[18] Defendants assert that OC spray was administered because Brown had covered the inside of his cell door (in violation of prison rules), made threats of self-harm, and refused to comply with orders to uncover the door.[19]

Brown filed suit in April 2020, alleging First Amendment retaliation and what appears to be Eighth Amendment claims of failure to protect, deliberate indifference to serious medical needs, and excessive force.[20] Brown also invokes the Equal Protection Clause of the Fourteenth Amendment, although he does not elaborate on this claim whatsoever.[21] Brown names as defendants Eric Tice (Superintendent of SCI Smithfield), Britton, Smith, Dell, and Lusk.

Defendants move for summary judgment on all claims against them.[22] Their Rule 56 motion is fully briefed and ripe for disposition.

---

[17] Doc. 1 ¶ 15.
[18] *Id.* ¶ 16.
[19] Doc. 33 ¶¶ 5-7.
[20] Doc. 1 ¶ 40.
[21] *Id.*
[22] Doc. 32.

## II.    STANDARD OF REVIEW

"One of the principal purposes of the summary judgment rule is to isolate and dispose of factually unsupported claims or defenses."[23]  Summary judgment is appropriate where "the movant shows that there is no genuine dispute as to any material fact and the movant is entitled to judgment as a matter of law."[24]  Material facts are those "that could alter the outcome" of the litigation, and "disputes are 'genuine' if evidence exists from which a rational person could conclude that the position of the person with the burden of proof on the disputed issue is correct."[25]

At the Rule 56 stage, the Court's function is not to "weigh the evidence and determine the truth of the matter" but rather "to determine whether there is a genuine issue for trial."[26]  The Court must view the facts and evidence presented "in the light most favorable to the non-moving party" and must "draw all reasonable inferences in that party's favor."[27]  This evidence, however, must be adequate—as a matter of law—to sustain a judgment in favor of the nonmoving party on the claim or claims at issue.[28]  A "scintilla of evidence" supporting the nonmovant's position is insufficient; "there must be evidence on which the jury

---

[23]  *Celotex Corp. v. Catrett*, 477 U.S. 317, 323-24 (1986).
[24]  FED. R. CIV. P. 56(a).
[25]  *EBC, Inc. v. Clark Bldg. Sys., Inc.*, 618 F.3d 253, 262 (3d Cir. 2010) (*quoting Clark v. Modern Grp. Ltd.*, 9 F.3d 321, 326 (3d Cir. 1993)).
[26]  *Anderson v. Liberty Lobby, Inc.*, 477 U.S. 242, 249 (1986).
[27]  *Thomas v. Cumberland County*, 749 F.3d 217, 222 (3d Cir. 2014).
[28]  *Liberty Lobby*, 477 U.S. at 250-57; *Matsushita Elec. Indus. Co. v. Zenith Radio Corp.*, 475 U.S. 574, 587-89 (1986).

could reasonably find for the [nonmovant]."[29]  Succinctly stated, summary

judgment is "put up or shut up time" for the nonmoving party.[30]

## III.  DISCUSSION

Before addressing Defendants' Rule 56 arguments, the Court must identify

the claimed constitutional violations and the actors involved.[31]  Brown alleges

First, Eighth, and Fourteenth Amendment infringements.  Yet careful examination

demonstrates that only the Eighth Amendment claims warrant full discussion, and

only as to certain Defendants.

### A.    First Amendment Retaliation

Although a prisoner's constitutional rights are necessarily circumscribed, an

inmate still retains First Amendment protections when they are "not inconsistent"

with prisoner status or with the "legitimate penological objectives of the

corrections system."[32]  To establish a First Amendment retaliation claim, a prisoner

must show that (1) "he was engaged in constitutionally protected conduct," (2) he

suffered an "adverse action" by prison officials sufficient to deter a person of

---

[29]  *Daniels v. Sch. Dist. of Phila.*, 776 F.3d 181, 192 (3d Cir. 2015) (quoting *Liberty Lobby*, 477 U.S. at 252) (alteration in original).

[30]  *Daubert v. NRA Grp., LLC*, 861 F.3d 382, 391 (3d Cir. 2017) (quoting *Berkeley Inv. Grp. v. Colkitt*, 455 F.3d 195, 201 (3d Cir. 2006)).

[31]  *Albright v. Oliver*, 510 U.S. 266, 271 (1994) ("The first step in any [Section 1983] claim is to identify the specific constitutional right allegedly infringed."); *Graham v. Connor*, 490 U.S. 386, 394 (1989) (explaining that analysis of a Section 1983 claim requires "identifying the specific constitutional right allegedly infringed by the challenged" conduct).

[32]  *Wisniewski v. Fisher*, 857 F.3d 152, 156 (3d Cir. 2017) (quoting *Newman v. Beard*, 617 F.3d 775, 781 (3d Cir. 2010)).

ordinary firmness from exercising his First Amendment rights, and (3) the inmate's

protected conduct was a "substantial or motivating factor" in the prison officials'

decision to take the adverse action.[33]

Simple recitation of the elements demonstrates that Brown's First

Amendment retaliation claim fails for two obvious reasons.  First, Brown has not

identified constitutionally protected conduct in which he was engaged.  Second,

Brown has not pled or established causation; that is, he has not shown that he was

retaliated against for engaging in conduct protected by the First Amendment.  The

gravamen of Brown's retaliation claim is that he was singled out and mistreated at

SCI Smithfield because he had previously assaulted Lusk.  Simply put, criminal

assault is not constitutionally protected conduct.  Thus, Brown's claim of First

Amendment retaliation must be dismissed.[34]

## B.    Fourteenth Amendment Equal Protection

The Equal Protection Clause of the Fourteenth Amendment provides that

"[n]o State shall . . . deny to any person within its jurisdiction the equal protection

---

[33]  *Id.* (quoting *Rauser v. Horn*, 241 F.3d 330, 333 (3d Cir. 2001)); *Mitchell v. Horn*, 318 F.3d 523, 530 (3d Cir. 2003) (quoting *Rauser*, 241 F.3d at 333).

[34]  *See* 28 U.S.C. § 1915(e)(2)(B)(ii).  Dismissal will be with prejudice because amendment of this claim would be futile.  Brown's allegations do not implicate the First Amendment, nor could they.  *See Chavarriaga v. N.J. Dep't of Corr.*, 806 F.3d 210, 222 (3d Cir. 2015) (explaining that courts must "identify the exact contours of the underlying right said to have been violated" and determine "whether the plaintiff has alleged a deprivation of a constitutional right at all") (quoting *Nicini v. Morra*, 212 F.3d 798, 806 (3d Cir. 2000)).

of the laws."[35]  To state a Fourteenth Amendment equal protection claim, a prisoner must allege "that he was treated differently than other similarly situated inmates, and that this different treatment was the result of intentional discrimination based on his membership in a protected class[.]"[36]

Once again, cursory review of the elements exposes the deficiencies in Brown's equal protection claim.  Brown alleges that he was treated differently than other inmates, but not based on his membership in a protected class (for example, because of race or religion).  Instead, Brown contends that he was subjected to disparate treatment because he previously assaulted a correctional officer.  These allegations do not, and cannot, set forth a Fourteenth Amendment equal protection claim.  This claim, therefore, must also be dismissed with prejudice.[37]

## C.    Personal Involvement

It is well established that, in Section 1983 actions, liability cannot be "predicated solely on the operation of *respondeat superior*."[38]  Rather, a Section 1983 plaintiff must aver facts that demonstrate "the defendants' personal involvement in the alleged misconduct."[39]  Personal involvement can include direct wrongful conduct by a defendant, but it can also be demonstrated through

---

[35]  U.S. CONST. amend. XIV, § 1.
[36]  *Mack v. Warden Loretto FCI*, 839 F.3d 286, 305 (3d Cir. 2016).
[37]  *See* 28 U.S.C. § 1915(e)(2)(B)(ii); *Chavarriaga*, 806 F.3d at 222.
[38]  *Rode v. Dellarciprete*, 845 F.2d 1195, 1207 (3d Cir. 1988) (citations omitted); *see also Ashcroft v. Iqbal*, 556. U.S. 662, 676 (2009) (affirming same principle in *Bivens* context).
[39]  *Dooley v. Wetzel*, 957 F.3d 366, 374 (3d Cir. 2020) (citing *Rode*, 845 F.2d at 1207).

allegations of "personal direction" or of "actual knowledge and acquiescence"; however, such averments must be made with particularity.[40]

The only claims remaining are Brown's allegations of various Eighth Amendment violations.  Liberally construing his complaint, as the Court must, it appears that Brown is asserting failure to protect for the July 3 event where he alleges he was aided and encouraged to commit self-harm; deliberate indifference to serious medical needs for the July 6 restraint-chair incident; and excessive force for being pepper sprayed without cause on August 3.  These claims, however, only involve three[41] Defendants: Dell, Smith, and Britton, respectively.  None of the other named Defendants had any personal involvement in the alleged Eighth Amendment violations and therefore cannot be held liable under Section 1983.  Accordingly, the Court turns to Brown's remaining Eighth Amendment claims against Dell, Smith, and Britton.

### D.    Eighth Amendment Claims

#### 1.    Failure to Protect – Dell

To establish an Eighth Amendment failure-to-protect claim against a prison official, the inmate must show that "(1) he was incarcerated under conditions posing a substantial risk of serious harm, (2) the official was deliberately

---

[40]    *Id.* (quoting *Rode*, 845 F.2d at 1207).

[41]    As explained above, the unidentified prison nurse involved in the July 6 incident has been dismissed from this case.

indifferent to that substantial risk to [the prisoner's] health and safety, and (3) the official's deliberate indifference caused [the prisoner] harm."[42]  In this context, deliberate indifference is a subjective standard; that is, "the prison official-defendant must actually have known or been aware of the excessive risk to inmate safety."[43]  Actual knowledge or awareness of a substantial risk to an inmate's safety can be proven "in the usual ways, including inference from circumstantial evidence."[44]

Brown's sworn allegations regarding his failure-to-protect claim are troubling.  He attests that Dell—who was specifically assigned to monitor Brown on suicide watch—not only stood idly by while Brown cut his neck with a razor blade for half an hour, but that Dell actually supplied the razor blade and encouraged Brown to "go for his jugular vein."[45]

Defendants argue that prison video footage from the July 3 incident contradicts Brown's allegations and does not show him harming himself.[46]  The trouble with Defendants' argument is that the hand-held video footage they submitted begins around 11:54 p.m., when prison officials are preparing to perform a cell extraction of Brown after the self-harm had already occurred.  In his prison

---

[42]  *Bistrian v. Levi*, 696 F.3d 352, 367 (3d Cir. 2012), *abrogated on other grounds by Mack v. Yost*, 968 F.3d 311 (3d Cir. 2020) (citing *Farmer v. Brennan*, 511 U.S. 825, 834 (1994)).

[43]  *Id.* (quoting *Beers-Capitol v. Whetzel*, 256 F.3d 120, 125 (3d Cir. 2001)).

[44]  *Id.* (quoting *Farmer*, 511 U.S. at 842).

[45]  Doc. 1 ¶¶ 20-21; Brown Dep. 17:8-19:14.

[46]  *See* Doc. 46 at 3.

grievances, Brown claimed that the razor blade neck-cutting incident with Dell occurred around "11:30 p.m."[47]  The video provided does show that (1) Dell was on duty around the time in question and participated in the cell extraction; and (2) when Brown is extracted, the right side of his neck and his clothing are covered in what appears to be blood.[48]

Consequently, there is a genuine dispute of material fact regarding what occurred in the late hours of July 3 in the psychiatric observation cell while Dell was stationed on suicide watch.  Defendants' video evidence does not conclusively disprove Brown's sworn allegations and deposition testimony.[49]  The video, in fact, substantiates Brown's claim that he cut his neck in his cell.  Taking Brown's version of the disputed facts as true, as the Court must,[50] a jury could reasonably find for Brown on his Eighth Amendment failure-to-protect claim.[51]  The Court, therefore, must deny Defendants' motion for summary judgment as to this claim.[52]

---

[47]  *See* Doc. 1 at 18-19.

[48]  *See* 7/3/18 Video at 2:18-20, 9:32-36, 10:20-40, 13:53-58.  All times refer to the video playback times and not the time of day.

[49]  Brown maintains that in-cell video from July 3 exists and is being intentionally withheld by Defendants because it "would be devastating to their defense."  Doc. 50 at 2.  Defendants neither confirm nor deny whether in-cell video from the relevant time exists, but none was provided to the Court or, apparently, to Brown.

[50]  *Big Apple BMW, Inc. v. BMW of N. Am., Inc.*, 974 F.2d 1358, 1363 (3d Cir.1992).

[51]  *See Daniels*, 776 F.3d at 192 (quoting *Liberty Lobby*, 477 U.S. at 252).

[52]  Defendants alternatively argue that, even if Brown establishes a constitutional violation, qualified immunity applies.  Doc. 35 at 14.  This argument is patently meritless with respect to the failure-to-protect claim.  Under the facts as proffered by Brown, where he avers that Dell provided the razor blade and encouraged suicide, any argument that these actions were reasonable and thus insulated from suit by qualified immunity is a nonstarter.

## 2.      Deliberate Indifference to Medical Needs – Smith

Brown's claim regarding the July 6 restraint-chair incident, as best the Court can tell, appears to be an assertion of deliberate indifference to serious medical needs.  In the context of prison medical care, the Eighth Amendment "requires prison officials to provide basic medical treatment to those whom it has incarcerated."[53]  To establish an Eighth Amendment deliberate indifference claim regarding inadequate medical care, a plaintiff must demonstrate "(i) a serious medical need, and (ii) acts or omissions by prison officials that indicate deliberate indifference to that need."[54]  A serious medical need is "one that has been diagnosed by a physician as requiring treatment or one that is so obvious that a lay person would easily recognize the necessity for a doctor's attention."[55]  Deliberate indifference by prison officials may be evidenced by intentional refusal to provide care known to be medically necessary, delayed provision of medical treatment for non-medical reasons, denial of prescribed medical treatment, or denial of reasonable requests for treatment resulting in suffering or risk of injury.[56]

Brown avers that he swallowed a razor blade, informed Smith and the nurse present that he did so, and that no medical treatment or evaluation was undertaken

---

[53]   *Rouse v. Plantier*, 182 F.3d 192, 197 (3d Cir. 1999).
[54]   *Natale v. Camden Cnty. Corr. Facility*, 318 F.3d 575, 582 (3d Cir. 2003).
[55]   *Monmouth Cnty. Corr. Inst. Inmates v. Lanzaro*, 834 F.2d 326, 347 (3d Cir. 1987).
[56]   *See Durmer v. O'Carroll*, 991 F.2d 64, 68 (3d Cir. 1993) (quoting *Lanzaro*, 834 F.2d at 346).

by anyone at SCI Smithfield.  Defendants counter that the video footage from the July 6 restraint-chair placement directly refutes Brown's allegation that he informed the attending nurse about swallowing a razor.[57]  They also maintain that Brown's claim fails because he has not demonstrated that he suffered any harm from the incident.

Upon review of the July 6 video, it is indisputable that Brown informed the nurse and correctional officers present (including Smith) that he had swallowed a piece of "razor wire" taken from the institution's fence, which he had recently used to cut himself.[58]  Brown does so on four separate occasions in the span of approximately three and a half minutes.[59]  At one point, he even asks Smith to repeat what he has told him, and Smith eventually responds that Brown stated that he "swallowed something."[60]

Nevertheless, Brown's Eighth Amendment medical indifference claim fails as a matter of law because Brown has not proffered any evidence of harm resulting from the purported lack of medical treatment.[61]  In other words, Brown has failed

---

[57] Doc. 35 at 13.

[58] *See* 7/6/18 Video at 12:42-13:08, 14:22-31, 15:20-42, 16:04-11.

[59] *See id.*

[60] *Id.* at 15:20-42.

[61] *See Brooks v. Kyler*, 204 F.3d 102, 105 n.4 (3d Cir. 2000) (explaining that prisoner's claim could not survive Rule 56 challenge because "he presented no evidence of any harm resulting from a delay in medical treatment") (citing *Hudson v. McMillian*, 503 U.S. 1, 9 (1992)); *Joh v. Suhey*, 709 F. App'x 729, 731 (3d Cir. 2017) (nonprecedential) (finding that brief delay in treatment did not demonstrate that medical provider disregarded "an excessive risk" to

to establish that he had a "serious medical need" to which prison officials were deliberately indifferent.  Brown does not include any allegations of injury in his verified complaint, nor does he provide a declaration or affidavit to such effect. He has likewise failed to adduce evidence that the purported lack of medical treatment exposed him to "undue suffering or the threat of tangible residual injury."[62]  Rather, Brown testified that he has swallowed razor blades to conceal them from prison authorities on more than ten occasions.[63]

Defendants, on the other hand, have produced medical records showing that immediately after the July 6 incident Brown was assessed by a medical provider, his neck injuries were deemed "superficial," he refused further medical treatment, and he was told to follow up by sick call as needed.[64]  On this record, the Court must grant summary judgment in Defendants' favor on Brown's Eighth Amendment medical indifference claim.

### 3.    Excessive Force – Britton

In a Section 1983 claim for excessive force, the "pivotal inquiry" is whether "force was applied in a good-faith effort to maintain or restore discipline, or

---

inmate's safety because inmate did not allege that "the delay in treatment led to any serious harm").

[62]  *Lanzaro*, 834 F.2d at 346 (citations omitted).

[63]  Brown Dep. 30:21-24.

[64]  Doc. 34-5 at 1-2.

maliciously and sadistically to cause harm."[65]  The factors analyzed when making this inquiry include: "(1) the need for the application of force; (2) the relationship between the need and the amount of force that was used; (3) the extent of the injury inflicted; (4) the extent of the threat to the safety of staff and inmates, as reasonably perceived by responsible officials on the basis of facts known to them; and (5) any efforts made to temper the severity of the forceful response."[66]

Brown's excessive force claim against Britton requires some initial clarification.  Brown maintains that on August 3, Britton deployed OC spray into his BMU cell without justification.[67]  Defendants assert that it was actually a different correctional officer—"Officer Glass"—who deployed OC spray into Brown's cell.[68]  This distinction, however, is immaterial.  The prison's August 3 "Extraordinary Occurrence Report" plainly states that "Sgt. D. Britton directed Officer T. Glass to retrieve OC spray" and "Officer Glass administered several bursts of OC into the cell[.]"[69]  And, during the videotaped debriefing of the incident, the commanding correctional officer likewise recounts that Britton "ordered" another officer to retrieve OC spray and deploy it into Brown's cell.[70]

---

[65]  *Ricks v. Shover*, 891 F.3d 468, 480 (3d Cir. 2018) (quoting *Smith v. Mensinger*, 293 F.3d 641, 649 (3d Cir. 2002)).
[66]  *Id.* (quoting *Smith*, 293 F.3d at 649).
[67]  *See* Doc. 1 ¶¶ 15-18; Brown Dep. 7:22-8:4.
[68]  *See* Doc. 33 ¶ 8; Doc. 35 at 8, 10.
[69]  Doc. 34-2 at 2.
[70]  *See* 8/3/18 Video at 54:24-37.

Because Glass appears to have acted on Britton's personal direction, Defendants' assertion the Britton lacked personal involvement in the incident is meritless.[71]

The parties offer competing versions of the August 3 events. According to Brown, Britton deployed the OC spray without any justification, and later told him that it was "for what he did to Lusk" at SCI Benner.[72] Brown avers that he did not make any threats of self-harm at that time,[73] and in his deposition testified that he "did not cover [his] door."[74]

Defendants assert that Brown both covered his door (in contravention of prison rules) and threatened self-harm to two prison officials before OC spray was used. Defendants cite the August 3 Extraordinary Occurrence Report, which indicates that Brown "had covered his cell door and made several threats of self-harm," and also "refused to comply with orders to uncover the door."[75] In the video from the incident, the commanding correctional officer recounts during the debriefing that Brown had covered his door and had told two prison officials, one of whom was Britton, that he was going to "cut his neck."[76] When Brown refused to comply with orders to uncover his door, OC spray was deployed.[77]

---

[71] *See Dooley*, 957 F.3d at 374 (citing *Rode*, 845 F.2d at 1207).
[72] Doc. 1 ¶¶ 15-16; Brown Dep. 6:4-7,
[73] *See* Brown Dep. 9:15-10:3; 8/3/18 Video at 46:17-23, 46:40-52, 52:07-30.
[74] Brown Dep. 7:9-21, 9:9-14.
[75] Doc. 33 ¶ 5; Doc. 34-2 at 2.
[76] 8/3/18 Video at 54:11-25.
[77] *Id.* at 54:25-36.

The Court's role at summary judgment is not to decide disputed factual issues.[78]  And the nonmovant's version of facts must be taken as true when there is a genuine dispute as to those facts.[79]  However, when video evidence of an incident is available, district courts must review that evidence and cannot accept a version of facts that is "visible fiction" in light of what is depicted in the footage.[80]

Two things are evident from review of the August 3 video.  First, contrary to Brown's deposition testimony, he had fully covered the window on the door of his BMU cell so that officers could not see inside the cell.[81]  Second, Brown refused to comply with orders to remove the covering on the door before OC spray was deployed.[82]  The Court cannot accept a version of facts from Brown that is "blatantly contradicted" by what is depicted in the video from that day.[83]

Thus, the only material fact that is genuinely disputed for this claim is whether Brown threatened self-harm before OC spray was used.  Brown maintains—both during the August 3 video and in this lawsuit—that he did not threaten self-harm that day; Defendants argue that the post-incident debriefing and

---

[78]  *Liberty Lobby*, 477 U.S. at 249; *Scott v. Harris*, 550 U.S. 372, 380 (2007).
[79]  *Big Apple BMW, Inc.*, 974 F.2d at 1363.
[80]  *Scott*, 550 U.S. at 380-81 ("When opposing parties tell two different stories, one of which is blatantly contradicted by the record, so that no reasonable jury could believe it, a court should not adopt that version of the facts for purposes of ruling on a motion for summary judgment."); *see Jacobs v. Cumberland County*, 8 F.4th 187, 192 (3d Cir. 2021).
[81]  *See* 8/3/18 Video at 00:00-20, 10:27-41.
[82]  *See id.* at 00:00-20.
[83]  *Scott*, 550 U.S. at 380; *Jacobs*, 8 F.4th at 192.

occurrence report prove otherwise.  Because Brown is the nonmovant, however, the Court must take Brown's version as true.[84]

When applying the excessive-force factors to the record evidence, the result strongly favors Defendants' position.  First, there was obviously a need for the use of force.  Brown—a BMU inmate with a history of mental illness who had just recently committed self-harm in July—had covered the door to his cell and refused to comply with orders to uncover the window.[85]  Correctional officers could have no way of knowing what Brown was doing in his cell, whether he was armed, or whether he was attempting to harm himself.  Even if Brown did not threaten self-harm that day, that would not alter the fact that Brown was housed in the BMU for mental health issues and—by his own admission—had attempted to seriously harm himself the previous month.  This first factor, therefore, favors Defendants.

The amount of force that was applied appears to be minimal with respect to the need for force to be used.  A correctional officer deployed short bursts of OC spray into the front of Brown's cell—once through the food aperture and then again through an opening at the top of the door.[86]  When weighed against the potential risk of Brown seriously injuring himself if correctional officers could not

---

[84]   *Big Apple BMW, Inc.*, 974 F.2d at 1363.
[85]   Brown admits that he knew covering his cell door was prohibited by prison policy.  *See* Brown Dep. 7:1-8.
[86]   *See* 8/3/18 Video at 00:20-45.

see into his cell (and Brown's noncompliance with verbal orders to uncover his door), this factor likewise cuts in favor of Britton's use of force being reasonable.

The extent of the injury inflicted is minimal.  During the video, when Brown exits his cell, he tells the nurse present that he is "not contaminated" by the OC spray and that he is "fine."[87]  Several minutes later, when asked if he wanted photographs taken, he declines and states, "I did not get sprayed."[88]  At one point during the video, Brown even questions Britton's competency as a correctional sergeant for not knowing how to properly deploy OC spray.[89]  Furthermore, Brown refused any medical treatment.[90]  This factor thus weighs heavily in Defendants' favor.[91]

The fourth factor examines "the extent of the threat to the safety of staff and inmates, as reasonably perceived by responsible officials on the basis of facts known to them."[92]  This factor, too, cuts against Brown.  Based on Brown's BMU

---

[87]  *Id.* at 46:08-17.

[88]  *Id.* at 46:52-47:08.

[89]  *Id.* at 49:02-10.

[90]  Doc. 34-2 at 2.

[91]  The Court observes that, in light of what is depicted on the video, it is doubtful whether Brown can meet the "*de minimis*" injury threshold for an excessive force claim.  *See Ricks*, 891 F.3d at 480 (quoting *Fuentes v. Wagner*, 206 F.3d 335, 345 (3d Cir. 2000)).  Taking Brown at his word on August 3, he did not get sprayed, was "fine," and thus suffered no injury at all.  Stated differently, the "force" employed did not contact Brown's person.  Nevertheless, the Court will address the excessive-force factors because, during his deposition, Brown testified that he did suffer some skin irritation from the OC spray in the days following the incident.  Brown Dep. 15:8-21.  In Eighth Amendment excessive force claims, the primary focus is the "nature of the force" employed, not the "extent of the injury" sustained.  *See Wilkins v. Gaddy*, 559 U.S. 34, 34 (2010); *Brooks*, 204 F.3d at 109.

[92]  *Ricks*, 891 F.3d at 480 (citation omitted).

placement and recent episodes of self-harm, Britton's use of OC spray was a reasonable mitigation tactic in light of the substantial risk of harm to Brown *from* Brown. This reasonable perception of significant risk, moreover, does not depend on whether Brown threatened self-harm that day.

The fifth and final factor is not susceptible to analysis and thus is neutral. The August 3 video begins at the point when Glass has retrieved the OC spray as requested by Britton. It does not depict what occurred leading up to when the OC spray was requested, other than that Brown's door was covered and he was refusing Britton's commands to uncover it. And neither party addresses this factor through briefing or evidence. Accordingly, it is not possible to tell if attempts were made to temper the severity of the application of force.

In sum, four of the five factors weigh in favor of Defendants' argument that force was applied in a good-faith effort to maintain or restore discipline, and some tilt the scales heavily toward this result. In contrast, none of the factors support Brown's position. On this record, a jury could not reasonably find that Britton's use of force was excessive under the circumstances, so the Court must grant summary judgment for Defendants on this claim.

## IV.   CONCLUSION

Based on the foregoing, the Court will grant in part and deny in part Defendants' motion (Doc. 32) for summary judgment. The Court will grant

Defendants' Rule 56 motion as to Brown's Eighth Amendment claims of medical indifference and excessive force.  The Court will deny Defendants' motion as to Brown's failure-to-protect claim against Dell.  The Court will also dismiss with prejudice Brown's First and Fourteenth Amendment claims.  An appropriate Order follows.

BY THE COURT:

*s/ Matthew W. Brann*
Matthew W. Brann
Chief United States District Judge